STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION; BELLSOUTH TELECOMMUNICATIONS, INC., APPLICANT; BELLSOUTH LONG DISTANCE, INC., INTERVENOR; PUBLIC STAFF—NORTH CAROLINA UTILITIES COMMISSION, INTERVENOR; MICHAEL F. EASLEY, ATTORNEY GENERAL, INTERVENOR; CAROLINA UTILITY CUSTOMERS ASSOCIATION, INC., INTERVENOR; AT&T COMMUNICATIONS OF THE SOUTHERN STATES, INC., INTERVENOR; INTERMEDIA COMMUNICATIONS INC., INTERVENOR; NORTH CAROLINA CABLE TELECOMMUNICATIONS ASSOCIATION, INTERVENOR; SPRINT COMMUNICATIONS COMPANY L.P., INTERVENOR; LCI INTERNATIONAL TELECOM CORP., INTERVENOR; DELTACOM, INC., INTERVENOR; ICG TELECOM GROUP, INC., INTERVENOR; TCG OF THE CAROLINAS, INC., INTERVENOR; TELECOMMUNICATIONS RESELLERS ASSOCIATION, INTERVENOR; THE ALLIANCE OF NORTH CAROLINA INDEPENDENT TELEPHONE COMPANIES, INTERVENOR; CONCORD TELEPHONE COMPANY, INTERVENOR; COMMUNICATIONS WORKERS OF AMERICA, INTERVENOR; BUSINESS TELECOM, INC., INTERVENOR; INTERPATH COMMUNICATIONS, INC., INTERVENOR; WORLDCOM, INC., INTERVENOR; KMC TELECOM, INC., INTERVENOR; COMPETITIVE TELECOMMUNICATIONS ASSOCIATION, INTERVENOR; ICG ACCESS SERVICES, INC., INTERVENOR; BELLSOUTH PERSONAL COMMUNICATIONS, INC., INTERVENOR; BELLSOUTH ADVERTISING & PUBLISHING CORPORATION, INTERVENOR; NORTH CAROLINA PAYPHONE ASSOCIATION, INC., INTERVENOR; FIBERSOUTH, INC., INTERVENOR; US LEC OF NORTH CAROLINA L.L.C., INTERVENOR; ATLANTIC TELEPHONE COMPANY, INTERVENOR; LEXCOM TELEPHONE MEMBERSHIP CORPORATION, INTERVENOR; PIEDMONT TELEPHONE MEMBERSHIP CORPORATION, INTERVENOR; RANDOLPH TELEPHONE MEMBERSHIP CORPORATION, INTERVENOR; SKYLINE TELEPHONE MEMBERSHIP CORPORATION, INTERVENOR; STAR TELEPHONE MEMBERSHIP CORPORATION, INTERVENOR; SURRY TELEPHONE MEMBERSHIP CORPORATION, INTERVENOR; TRI-COUNTY TELEPHONE MEMBERSHIP CORPORATION, INTERVENOR; WILKES TELEPHONE MEMBERSHIP CORPORATION, INTERVENOR; AND YADKIN VALLEY TELEPHONE MEMBERSHIP CORPORATION, INTERVENOR, APPELLEES v. MCI TELECOMMUNICATIONS CORPORATION, INTERVENOR; MCIMETRO ACCESS TRANSMISSION SERVICES, INC., INTERVENOR; AND TIME WARNER COMMUNICATIONS OF NORTH CAROLINA, L.P., INTERVENOR, APPELLANTS, AND GTE COMMUNICATIONS, INTERVENOR, CROSS-APPELLANT

No. COA98-759

(Filed 6 April 1999)

## 1. Appeal and Error— appeal from petition for reconsideration—inferred intent to appeal from original order

Appeals from a Utilities Commission denial of a motion to reconsider an order declining to treat certain material as confidential were timely and adequate. Although the denial of a petition for reconsideration is a nonappealable order and the notices of appeal do not designate an appeal from the original order, it can be fairly inferred from the notices that the appellants intended to appeal from the original order and there is no indication in the record that the appellees were misled.

626    IN THE COURT OF APPEALS

STATE ex rel. UTILITIES COMM'N v. MCI

[132 N.C. App. 625 (1999)]

## 2. Public Records— Utilities Commission—telecommunications documents

The Utilities Commission erred by ordering that certain information submitted by telecommunications companies would not be protected from public disclosure. Public records under N.C.G.S. § 132-1.1 do not include trade secrets which are the property of private persons disclosed in compliance with the law and designated confidential. A private person under the Act is a non-governmental legal or commercial entity; although the appellants here are subject to government regulation by the Commission, the regulation is not comprehensive and does not overshadow the independent authority of the appellants over the operation of their own businesses. The information is a trade secret within the exception to the Act because it consists of a compilation of information which has actual or potential commercial value from not being generally known and is the subject of reasonable efforts to maintain its secrecy. The Legislature did not make any distinction in N.C.G.S. § 132-1.2 for regulated industries.

Appeal by appellants MCI Telecommunications Corporation and MCImetro Access Transmission Services, Inc., and Time Warner Communications of North Carolina, L.P., and by cross-appellant GTE Communications from order filed 28 January 1998 by the North Carolina Utilities Commission. Heard in the Court of Appeals 23 February 1999.

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Wade H. Hargrove, Marcus W. Trathen, and David Kushner, for appellants MCI Telecommunications Corporation, MCImetro Access Transmission Services, Inc., and Time Warner Communications of North Carolina, L.P.*

*Parker, Poe, Adams & Bernstein L.L.P., by Jack L. Cozort, for cross-appellant GTE Communications.*

*Chief Counsel Antoinette R. Wike, by Staff Attorney Robert S. Gillam, for appellee Public Staff—North Carolina Utilities Commission.*

*BellSouth Telecommunications, Inc., by Andrew D. Shore and Leon Lee, and Kilpatrick Stockton, by James P. Cain and Benjamin R. Kuhn, for appellee BellSouth Telecommunications, Inc.*

STATE EX REL. UTILITIES COMM'N v. MCI

[132 N.C. App. 625 (1999)]

*Parker, Poe, Adams & Berstein L.L.P., by Jack L. Cozort, for appellees ICG Telecom Group, Inc., KMC Telecom, Inc., and Interpath Communications, Inc.*

*No briefs filed for other appellees.*

GREENE, Judge.

MCI Telecommunications Corporation, MCImetro Access Transmission Services, Inc., and Time Warner Communications of North Carolina, L.P. (collectively, Appellants), and GTE Communications (Cross-Appellant) (collectively, Joint Appellants) appeal from the North Carolina Utilities Commission's (Commission) "Order Denying Motion For Reconsideration."

Local telephone service historically has been provided by a monopoly Incumbent Local Exchange Company (ILEC) in a specific local service area. In 1995, in an effort to foster competition in local telephone service, the General Assembly enacted legislation authorizing the certification of certain competitive local providers (CLPs) of telecommunication service. N.C.G.S. § 62-110(f1) (Supp. 1998). The Joint Appellants are some of those certified as CLPs by the Commission.

In February of 1996, the Commission adopted permanent rules governing the CLPs, and authorized them to compete in those service areas with over 200,000 access lines. One of the Commission's rules, Rule R17-2(k), requires the CLPs to file monthly "access line reports," "reflecting the number of local access lines subscribed to at the end of the preceding month by business and residence customers in each respective geographic area served by the CLP."

On 11 August 1997, the Commission, at the request of BellSouth Telecommunications, Inc. (BellSouth), issued an Order requiring, "all CLPs certified by this Commission shall file monthly reports responding to [a list of thirteen] questions" entitled "Questions For Competing Carriers [(QCC)]." Those thirteen questions are as follows:

1. Is (CLP name) providing telephone exchange service in North Carolina as defined in Section 3 (47) of the Telecommunications Act of 1996 ("the Act") but excluding exchange access?

STATE EX REL. UTILITIES COMM'N v. MCI

[132 N.C. App. 625 (1999)]

2. Has (CLP name) requested interconnection and signed an agreement with BellSouth? If answer to this item is yes, please respond to the following questions.

3. As a competing provider of telephone exchange service, that has an agreement with BellSouth approved under Section 252 of the Act, is (CLP name) providing telephone exchange service to residential customers in North Carolina?

4. As a competing provider of telephone exchange service that has a binding agreement with BellSouth, is (CLP name) providing telephone exchange service to business customers in North Carolina?

5. Is (CLP name) providing such telephone exchange service in North Carolina exclusively over its own facilities?

6. Is (CLP name) providing such telephone exchange service in North Carolina predominantly over its own facilities in combination with the resale of telecommunications from another carrier?

7. How many business customers are served using your own facilities or unbundled elements and when did you begin providing service?

8. How many business customers are served by reselling BellSouth's retail services, and when did you begin providing service?

9. How many residential customers are served using your own facilities or unbundled elements and when did you begin providing service?

10. How many residential customers are served by reselling BellSouth's retail services, and when did you begin providing service?

11. If you are not currently offering local service, when do you plan to begin offering local service?

12. Please provide detailed plans of how you intend to serve business customers using your own facilities or unbundled elements.

IN THE COURT OF APPEALS 629

STATE ex rel. UTILITIES COMM'N v. MCI

[132 N.C. App. 625 (1999)]

13. Please provide detailed plans of how you intend to serve residential customers using your own facilities or unbundled elements.

On 21 October 1997, the Commission issued an "Order Concerning Confidentiality Of Report Filings" (Original Order) wherein it concluded that the information required to be disclosed in the "access line reports" and in response to questions 1-11 of the QCC, did not constitute a "trade secret" within the meaning of G.S. 66-152(3) and thus was not protected from public disclosure. The Commission acknowledged that answers to questions 12 and 13 of the QCC "may constitute trade secrets." The Commission thus rejected the claims of confidentiality asserted by a number of the CLPs, who previously had filed the required information under proprietary seal.

On 5 November 1997, several of the CLPs filed a "Joint Petition for Reconsideration," requesting the Commission "reconsider its Order dated October 21, 1997, declining to treat certain information as confidential." In their petition, the CLPs contended the information contained within the "access line reports" and QCC responses constituted trade secrets, and thus, pursuant to the "confidential information" exception to Chapter 132 of the North Carolina General Statutes (Public Records Act), was exempt from the Public Records Act's general requirement of public disclosure.

On 28 January 1998, the Commission denied the CLPs' "Joint Petition for Reconsideration," concluding, *inter alia*, that the trade secret exception to the Public Records Act must "be analyzed within the context of a regulated industry. This means that what may perhaps be deemed to be a 'trade secret' within a totally and freely competitive marketplace should not necessarily be construed to be a 'trade secret' within a regulated marketplace." The Commission also justified its decision stating, "the numerous public interests . . . have a legitimate—and, in some cases, a compelling—need for this information." Finally, the Commission cited several broad regulatory powers conferred to it by the General Assembly in support of its "public interest" justification for upholding its decision of public disclosure.[1] In denying the petition, the Commission concluded that its Original Order "should be upheld."

---

1. The Commission cited, among others, N.C. Gen. Stat. §§ 62-2 (power to provide fair regulation of Public Utilities in the interest of the public); 62-30 (general power and authority to supervise and control utilities); 62-31 (power to make and enforce reasonable rules); and 62-32 (general supervision power over rates and services).

The Joint Appellants now appeal the denial of the petition for reconsideration.

The dispositive issues are whether: (I) the appeals are timely and adequate; and (II) (A) the Joint Appellants are "private persons" within the meaning of section 132-1.2(2), and (B) the information included in the "access line reports" and QCC responses are "trade secrets" within the meaning of section 132-1.2(1).

## I

## Notices of Appeal

[1] Pursuant to section 62-80, the Commission has the authority, upon its own motion or upon motion by any party, "to reconsider its previously issued order, upon proper notice and hearing" and "upon the record already compiled, without requiring the institution of a new and independent proceeding by complaint or otherwise." *Utilities Comm. v. Edmisten*, 291 N.C. 575, 582, 232 S.E.2d 177, 181 (1977); N.C.G.S. § 62-80 (1989). At this rehearing, the Commission may rescind, alter, amend, or refuse to make any change to its earlier order. *Id.* An application for rehearing pursuant to section 62-80 "is addressed to and rests in the discretion of the [Commission]." *Utilities Comm. v. Services Unlimited, Inc.*, 9 N.C. App. 590, 591, 176 S.E.2d 870, 871 (1970). An appeal does not lie from the *denial* of a petition to rehear, as the appeal is from the original order, and the time for appealing the original order is tolled from the date of the filing of the petition for rehearing to the date of the denial of that petition. *Utilities Comm. v. R.R.*, 224 N.C. 762, 765, 32 S.E.2d 346, 348 (1944). An appeal from an order of the Commission must be made "within 30 days after [its] entry." N.C.G.S. § 62-90(a) (1989) (listing some exceptions to general rule).

## Timeliness

In this case, the Original Order was entered on 21 October 1997. The petition for reconsideration was filed on 5 November 1997. The order of the Commission denying the motion for reconsideration was entered on 28 January 1998. Appellants filed their notice of appeal on 10 February 1998. Cross-Appellant filed its notice of appeal on 2 March 1998. Both appeals are timely.

Appellants, the first parties to appeal in this case, filed their appeal 112 days after the entry of the Original Order. Eighty-four of those days, however, are not considered in computing whether the

appeal is timely, as those days represent the time between the filing of the petition for reconsideration and the order denying that motion, and thus the running of the time for appeal was tolled during that period. The appeal by Appellants therefore was filed twenty-eight days after the entry of the Original Order.

Cross-Appellant's notice of appeal was filed 132 days after the entry of the original order and thus is outside the thirty-day period, even with the benefit of the tolling period. Cross-Appellant, however, is entitled to the benefit of section 62-90, which provides that a party, after another party has appealed, has twenty days after the first notice of appeal was filed to file a cross appeal. N.C.G.S. § 62-90(a); *cf.* N.C.R. App. P. 3(c) (second party to appeal has ten days after first notice of appeal to file appeal). In this case, Cross-Appellant filed its cross appeal on the 20th day after Appellants filed their notice of appeal.

## Adequacy

Joint Appellants state in their notices of appeal that they are appealing from the denial of their petition for reconsideration, a non-appealable order. Although the notices of appeal do not designate an appeal from the Original Order, N.C.R. App. P. 3(d) (notice of appeal "shall designate the judgment or order from which appeal is taken"), it "can be fairly inferred" from the notices that Joint Appellants intended to appeal from the Original Order,[2] and because there is no indication in this record that the appellees were misled by the notices, we construe the notices as appeals from the Original Order. *See Foreman v. Sholl,* 113 N.C. App. 282, 291, 439 S.E.2d 169, 175 (1994), *disc. review dismissed as improvidently granted,* 339 N.C. 593, 453 S.E.2d 162, *and reh'g denied,* 340 N.C. 18, 456 S.E.2d 313 (1995); *see also In re Foreclosure of Allan & Warmbold Constr. Co.,* 88 N.C. App. 693, 696, 364 S.E.2d 723, 725, *disc. review denied,* 322 N.C. 480, 370 S.E.2d 222 (1988) (appeal of final order permits review of intermediate orders necessarily affecting final order).

## II

[2] The public records compiled by the agencies of North Carolina, including the Commission, "are the property of the people." N.C.G.S. § 132-1(b) (1995); N.C.G.S. § 132-1(a) (state agencies include all commissions of North Carolina). Thus, any person may obtain copies of

---

2. The issues raised in the Original Order and the order denying reconsideration of that order are precisely the same.

the public records. N.C.G.S. § 132-1(b). Public records are defined to include all documents and papers "made or received pursuant to law . . . in connection with the transaction of public business" by any state agency.[3] N.C.G.S. § 132-1(a). Public records, however, *do not* include: (1) written communications to any agency by an attorney serving that agency if made in the scope of the attorney-client relationship, N.C.G.S. § 132-1.1 (Supp. 1998); (2) information (a) constituting a trade secret as defined in N.C. Gen. Stat. § 66-152(3), (b) the property of a private person as defined in N.C. Gen. Stat. § 66-152(2), (c) disclosed in compliance with the law, and (d) designated as "confidential" at the time of its disclosure to the agency, N.C.G.S. § 132-1.2 (1995); or (3) records of criminal investigations conducted or criminal intelligence information compiled by public law enforcement agencies, N.C.G.S. § 132-1.4(a) (Supp. 1998).

### (A) Private Persons

In this case, Joint Appellants first contend they are "private persons" within the meaning of section 132-1.2(a). We agree.[4]

A private person,[5] within the meaning of section 132-1.2(2), is any non-governmental "legal or commercial entity." N.C.G.S. § 66-152(2) (1992) (defining "person"); *Wilmington Star News v. New Hanover Regional Medical Center*, 125 N.C. App. 174, 182, 480 S.E.2d 53, 57, *appeal dismissed*, 346 N.C. 557, 488 S.E.2d 826 (1997) (defining "private"). Thus a governmental entity or agency, as defined in section 132-1(a), does not qualify as a private person within the meaning of section 132-1.2(2). It does not follow, however, that every entity excluded from the section 132-1(a) definition of public agency is a private person within the meaning of section 132-1.2(2). *See Publishing Co. v. Hospital System, Inc.*, 55 N.C. App. 1, 284 S.E.2d 542 (1981) (private nonprofit hospital treated as governmental agency), *disc. review denied*, 305 N.C. 302, 291 S.E.2d 151, *and*

---

3. It is not disputed that the "access line reports" and QCC responses qualify as public records under section 132-1(a).

4. There is no dispute among the parties that the information was provided to the Commission in compliance with the law and has been designated by the provider as confidential. Thus the requirements of section 132-1.2(3) & (4) are satisfied.

5. Whether a person is a "private person" within the meaning of section 132-1.2(2) presents a mixed question of fact and law. *See Woodard v. Mordecai*, 234 N.C. 463, 472, 67 S.E.2d 639, 645 (1951) (if resolution of an issue requires application of legal principles, it is treated as one of law); *Gallimore v. Marilyn's Shoes*, 292 N.C. 399, 402, 233 S.E.2d 529, 531 (1977) (whether an injury is an accident arising out and in the course of the employment is a mixed question of law and fact). In this case, there is no dispute about the facts, and thus we are confronted with a question of law.

*appeal dismissed and cert. denied*, 459 U.S. 803, 74 L. Ed. 2d 42 (1982). Thus private corporations can be classified as a public agency, for the purposes of section 132-1.2(2). The critical inquiry, therefore, is whether the corporation's independent authority is overshadowed by the governmental control of that corporation. *Id.* at 9, 284 S.E.2d at 547. Thus the nature of the relationship between the corporation and the government is controlling, not the form of the entity. *Id.* at 10-11, 284 S.E.2d at 548.

In this case, Joint Appellants are all legal and/or commercial corporations in the business of conveying or transmitting messages or communications by telephone. They are not owned or operated by the government and do not qualify as an agency of the government within the meaning of section 132-1(a). Each of them, however, offers their services to the public for compensation and thus are classified as a "public utility" within the meaning of the Public Utilities Act, N.C.G.S. § 62-3(23)(a)(6) (Supp. 1998), and as such, are subject to "fair regulation" by the Commission, N.C.G.S. § 62-2(a)(1) (Supp. 1998). This regulation by the Commission, though material, is not comprehensive and therefore does not overshadow the independent authority exercised by Joint Appellants over the operation of their own businesses. *See Publishing Co.*, 55 N.C. App. at 11, 284 S.E.2d at 548-49 (Wake County's "supervisory responsibilities and control" over hospital were extensive and converted private nonprofit hospital into public agency). Thus Joint Appellants are "private persons" within the meaning of section 132-1.2(2).

### (B) Trade Secrets

Joint Appellants next contend the information provided in the "access line reports" and QCC responses are "trade secrets"[6] within the meaning of section 132-1.2(1). We agree.

A trade secret is defined as:

[B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

---

6. Whether information qualifies as "trade secrets" within the meaning of section 132-1.2(1) also presents a mixed question of fact and law. *See* note 4. Again, there is no dispute about the facts and we thus are confronted with a question of law.

634 IN THE COURT OF APPEALS

STATE ex rel. UTILITIES COMM'N v. MCI

[132 N.C. App. 625 (1999)]

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

When determining whether information is a trade secret, the following factors are proper to consider:

(1) the extent to which information is known outside the business;

(2) the extent to which it is known to employees and others involved in the business;

(3) the extent of measures taken to guard secrecy of the information;

(4) the value of information to business and its competitors;

(5) the amount of effort or money expended in developing the information; and

(6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star News,* 125 N.C. App. at 180-81, 480 S.E.2d at 56.

Our review of the *Wilmington Star* factors in the context of section 66-152(3) reveals that the information sought in the "access line reports" and QCC responses consists of a "compilation of information" which has "actual or potential commercial value from not being generally known" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." The information thus constitutes "trade secret[s]" within the meaning of section 132-1.2(1).

The information sought is collected by the CLPs for their own use and, except for the requirement that it be disclosed to the Commission, is not available to the public. Indeed, to provide public access to this information would provide competitors rather extensive insight into the business plans and operations of a particular CLP, information that otherwise would not be available generally. Disclosure of this information would allow competitors to discover how a CLP serves its customers, a CLP's plans for entering the local market and how quickly it acquires new customers, and in which areas of the state the CLP is focusing its marketing efforts and the relative effectiveness of those efforts. Most importantly, disclosure of

such information would thwart the creativity and innovation that competition brings to the marketplace, and prohibit the competitive environment our legislature intended to create.

Accordingly, the information sought in the "access line reports" and QCC responses fit within the section 132-1.2 exception to the Public Records Act. In so holding, we specifically reject the position of the Commission that this exception must be construed differently because it arises in the context of a regulated industry. We acknowledge the broad powers of the Commission to provide fair regulation of our public utilities. The legislature, however, in promulgating the section 132-1.2 exception to the Public Records Act, did not make any distinction with respect to its application to regulated industries. We therefore are without authority to provide for one. Furthermore, we do not read the preamble to section 132-1.2, "Nothing in this article shall be construed to require or authorize a public agency to disclose any information," to permit the Commission, under its broad supervisory powers, to require disclosure of information that otherwise qualifies under section 132-1.2. To read section 132-1.2 in this manner would permit the Commission to choose either to apply this exception or refuse to apply it. In the absence of a more specific statute on this issue, we do not believe the Commission has that authority. *Utilities Comm. v. Electric Membership Corp.*, 275 N.C. 250, 260, 166 S.E.2d 663, 670 (1969); *Highway Commission v. Hemphill*, 269 N.C. 535, 538-39, 153 S.E.2d 22, 26 (1967) (statute dealing with a specific situation controls other statutes which are general in their application). Indeed, the Commission is a public agency within the meaning of the Public Records Act and is bound by the Act and its exceptions. N.C.G.S. § 132-1(a).[7]

Reversed.

Judges LEWIS and HORTON concur.

---

7. BellSouth argues that it cannot offer long distance service until it proves to the Federal Communications Commission (FCC) that there is sufficient local telecommunications competition in North Carolina. *See* 47 U.S.C. § 271 (Supp. 1998). They further argue that without access to the information sought in the "access line reports" and QCC responses, they cannot satisfy the requirements of the FCC. Although we are sympathetic to the position of BellSouth, we cannot misconstrue section 132-1.2 because of their need for the information.